CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
9/27/2018
JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| TECHINT SOLUTIONS GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:18-cv-00037 |
| | ) | |
| BRANDON SASNETT, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this action to enforce a non-solicitation agreement between TechINT Solutions Group, LLC, and its former employee, Brandon Sasnett, TechINT has moved for a preliminary injunction. (Dkt. No. 4.) The matter has been fully briefed and argued before the court. For the following reasons, the court will grant TechINT's motion for preliminary injunction, but will not grant all of the relief requested in the motion.

I.  INTRODUCTION[1]

TechINT provides intelligence and training services, including services regarding Unmanned Aircraft Systems (UAS), to government and commercial clients. TechINT hired Sasnett as an intelligence analyst in 2013.

On January 1, 2016, Sasnett entered into three agreements with TechINT: 1) a Profits Interest Award Agreement, under which Sasnett was granted "award units" in TechINT and admitted as a member; 2) an Amended and Restated Operating Agreement, which governed his rights and obligations as a member; and 3) a Services Agreement (the Agreement), under which

---

[1] The complaint contains claims for breach of contract, tortious interference, conversion, conspiracy, and breach of fiduciary duty. The parties' briefing on TechINT's motion for a preliminary injunction addressed all of these claims. Nevertheless, at the hearing, TechINT informed the court that it seeks preliminary injunction solely based upon the first claim, breach of contract. Thus, the court will recite only facts relevant to the breach of contract claim.

Sasnett became Director of Intelligence (later, Director of UAS Threat Intelligence, Fabrication, and Training). The Agreement provides in pertinent part:

> **4.** **Non-Solicitation.** Sasnett agrees as follows:
>
> a. <u>Non-Solicitation and Non-Service of Clients.</u> During the Term[2] and the Restricted Period, Sasnett shall not, on his own behalf or on behalf of any other person or entity (except the Company), whether in the capacity of an owner, shareholder, member, partner, officer, employee, director, manager, independent contractor or otherwise, solicit to provide or provide any Competing Services to any Client of the Company. The term "Client" as used herein means (i) any entity, including without limitation, any government department, agency or division, for which the Company has performed any services in any capacity (including as a Prime contractor and/or subcontractor) at any time during the twelve (12) month period immediately preceding the Termination Date (defined below); or (ii) any entity, including without limitation, any government department, agency or division, to which the Company has marketed any of its services to at any time prior to the Termination Date; provided that (1) the Company's marketing efforts were specifically targeted to such entity and were not merely in the form of general marketing activities such as running an advertisement in an industry publication; and (2) Sasnett was aware of and/or participated in such marketing efforts. The term "Competing Services" are any services that are provided, offered or marketed by the Company at any time during the Term, including without limitation, intelligence analysis and Counter IED services. The "Restricted Period" is the 2-year period immediately following the Termination Date.
>
> ****
>
> c. <u>Non-Solicitation and Non-Hiring of Personnel.</u> During the Term of this Agreement and during the Restricted Period, Sasnett shall not, on his own behalf or on behalf of any other person or entity, solicit for employment or hire, or assist in the solicitation or hiring of, any member, employee or contractor who worked for the Company during the twelve (12) month period immediately preceding the Termination Date. This restriction includes without limitation, providing to any prospective employer the identities of any of the members, employees or contractors of the Company, or assisting any of the members, employees or contractors of the Company in obtaining employment with Sasnett or any other person or entity through dissemination of resumes or otherwise.

---

[2] "The Company's engagement of Sasnett shall be on an at-will basis, and the Company may terminate this Agreement and Sasnett's engagement . . . at any time and for any reason, or for no reason. The engagement of Sasnett pursuant to the terms of this Agreement shall commence effective as of January 1, 2016 and shall continue until terminated as set forth in Section 9 below." (Servs. Agt. ¶ 2.)

****

    e.    <u>Reasonableness of Restrictive Covenants.</u>  Sasnett acknowledges that Sasnett could harm the legitimate and protectable business interests of the Company if Sasnett breaches any of the provisions of this Section 4.  The parties mutually agree that the terms and restrictions set forth in this Section 4 are reasonable in light of relevant factors and circumstances, and Sasnett specifically acknowledges and agrees that the restrictions set forth in this Section 4 are reasonable in terms of scope, duration, lack of geographic restriction, and the respective interests of the parties.  Moreover, Sasnett agrees that the terms and restrictions are: (i) no greater than necessary to protect the Company's legitimate and protectable business interests, (ii) not unduly harsh in curtailing Sasnett's efforts to earn a livelihood, and (iii) consistent with sound public policy.

****

**8.    Remedies.**  Any breach of the terms of Sections 4, 5, 6, or 7 of this Agreement shall be a material breach of this Agreement.  In view of the nature of the activities in which Sasnett is engaged, Sasnett acknowledges that any violation of Sections 4, 5, 6, or 7 of this Agreement would result in irreparable harm to the Company.  Sasnett therefore acknowledges that, in the event of violation of any of Sections 4, 5, 6, or 7 of this Agreement, the Company shall be entitled to obtain from any court of competent subject matter jurisdiction preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation, which right shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.  The parties agree that such relief will be available without the necessity of posting bond.  If the Company brings any action to enforce its rights under Sections 4, 5, 6, or 7 of this Agreement, it shall be entitled to recover its costs, including its reasonable attorneys' fees, incurred during litigation, mediation, negotiation or arbitration relating to any alleged breach.

(Servs. Agt. 3–4, 7–8, Dkt. No. 5-1.)  Sasnett and another employee, Archie Stafford, comprised TechINT's entire external UAS division, of which Sasnett was the lead.

In July 2017, TechINT performed UAS-related services for Red Six Solutions, LLC (Red Six or Red-Six),[3] including an exercise led by Sasnett.  TechINT billed, and Red Six paid, $18,800 for those services.  Scott Crino, CEO of Red Six, stated in his affidavit: "TechINT had actually over-billed Red-Six for the maximum amount of work allowed under this Purchase Order, which was clearly set at $18,800.  At no time did Red-Six authorize any additional work under this Purchase Order by TechInt . . . .  Thus, TechINT's allegation . . . that it had a

---

[3] The parties' briefing mostly uses the term without the hyphen; many affidavits include it.

3

reasonable expectation of $65,530.00 in additional work pursuant to the Purchase Order is baseless." (Crino Aff. ¶ 6, Dkt. No. 19-4.) In direct contradiction with Crino's testimony, however, Red Six engaged TechINT under a modified purchase order for an amount up to $84,330 for UAS-related services, effective August 29. (Modified Purchase Order, Dkt. No. 21-1.) The purchase order listed the period of performance from December 13, 2016, to September 10, 2018, the previous ceiling as $18,800, and the ceiling change of $65,530. (*Id.*)

On October 11, 2017, a few months after the July work for Red Six, Sasnett provided his notice of resignation to TechINT, effective immediately. According to Sasnett, he had learned that day "that TechINT's President . . . had been terminated by" Craig Funicello, its founder and current CEO. (Sasnett Aff. ¶ 14, Dkt. No. 19-3.) Shortly thereafter, Sasnett modified his LinkedIn account to reflect that he had begun working at Red Six as Director of Threat Analysis. Sasnett and Crino provided conflicting testimony during the hearing regarding who had reached out to whom when Sasnett began working for Red Six. On October 17, Red Six modified its purchase order with TechINT, changing the ceiling back from $84,330 to $18,800—the amount already billed for services performed in July 2017. In an email, Crino explained to TechINT's then-president, "We will no longer require the services of [TechINT]." (Oct. 17 Email 41, Dkt. No. 5-1.) TechINT asserts that it suffered a loss of $65,530 under the purchase order and substantial losses for UAS-related work that it reasonably expected to perform for Red Six in the future.

TechINT asserts that it learned, on January 29, 2018, that Sasnett would provide USA services for Red Six that coming week—services which were the same or substantially the same as the services TechINT had planned to provide. On the same date, TechINT also learned that Sasnett was providing UAS services to ELTA North America (ELTA NA), another "client" of

4

TechINT. After the hearing, TechINT sought leave to file additional materials in support of its request for preliminary injunction, which the court granted over Sasnett's objection. (Dkt. No. 76.) TechINT asserts that it discovered additional breaches by Sasnett of the Agreement through emails sent to Sasnett's old TechINT email address. That evidence demonstrates Sasnett also provided services to the United States Marine Corps (USMC), the Combating Terrorism Technical Support Office, Cherokee Nation Strategic Programs, and the Canadian Special Forces, all of whom TechINT asserts are its "clients" for purposes of the Services Agreement. (Funicello Supp. Decl. ¶¶ 8–20, Dkt. No. 49-1.) In particular, the emails highlight the overlap between TechINT's and Sasnett's provision, or proposed provision, of services, as well as the resulting loss of business and other adverse consequences to TechINT. (*See, e.g.*, *id.* ¶ 8 ("On May 18, 2018, emails were sent to Mr. Sasnett's old TechINT email address from USMC military officers and from Red Six employees, which confirm that Mr. Sasnett is providing services to the USMC, which is TechINT's client . . . and is providing the USMC with services he formerly provided on behalf of TechINT, including UAS services."); USMC Emails, Ex. 5.)

In its motion for preliminary injunction, TechINT asks the court to temporarily enjoin Sasnett from "[p]roviding competing services to TechINT's clients, as set forth in the Services Agreement, to include enjoining Sasnett from providing UAS-related and other services to Red Six Solutions, LLC." (Pl.'s Mot. 21, Dkt. No. 5.)[4]

## II. DISCUSSION

### A. Subject Matter Jurisdiction

TechINT alleges that the court has diversity jurisdiction over this matter under 28 U.S.C. § 1332. In its complaint, TechINT pleaded damages in an amount to be proven at trial, but not

---

[4] The court does not discuss TechINT's initial request that the court enjoin additional activities not related to the breach of contract claim. (*See* Pl.'s Mot. 21.)

less than the value of the Red Six contract and certain equipment that TechINT alleges Sasnett stole—$65,530 and $13,640, respectively—in addition to its request for injunctive relief and its claim for attorneys' fees under Sasnett's contract.

At the hearing, Sasnett suggested that the court may not have subject matter jurisdiction over this matter, and the parties have since briefed the jurisdictional issue. The court informed the parties at a separate hearing on Sasnett's motion to dismiss that it had determined that it has subject matter jurisdiction, but it will briefly explain its reasons herein.

Diversity jurisdiction exists in all civil actions between citizens of different states in which the matter in controversy exceeds $75,000. 28 U.S.C. § 1332(a). Once the propriety of the amount in controversy is challenged, the party seeking to invoke the subject matter jurisdiction of the federal courts has the burden of proving its existence under *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). In *St. Paul Mercury*, the Supreme Court announced the legal certainty test: "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." 303 U.S. at 288. "It must appear to a legal certainty that [a plaintiff's] claim is really for less than the jurisdictional amount to justify dismissal" for want of subject matter jurisdiction. *St. Paul Mercury*, 303 U.S. at 289. To determine whether it is a "legal certainty" that the plaintiff's claim cannot meet the minimum amount in controversy, the court assesses, from the date the complaint was filed, if the plaintiff reasonably could expect to recover the sum sought. *Work v. U.S. Trade, Inc.*, 747 F. Supp. 1184, 1188 (E.D. Va. 1990).

Sasnett argues that it is a "legal certainty" that TechINT cannot recover damages that reach the jurisdictional amount because a) TechINT may not seek the entire gross amount of the

purchase order, b) TechINT's president testified at the preliminary injunction hearing that he does not know whether any of the equipment at issue was, indeed, stolen by Sasnett, and c) the value of injunctive relief requested after TechINT limited its request is so low. But Sasnett misunderstands TechINT's burden as to the amount in controversy. TechINT's alleged sum includes a contract loss of $65,530, equipment loss of $13,640, the loss of legal fees, and further damages from Sasnett's provision of work to TechINT clients. That TechINT limited its request for relief solely for the purpose of its motion for preliminary injunction has no bearing on whether its claims meet the minimum amount in controversy. "[V]iewed from the date the complaint was filed," *Work*, 747 F. Supp. at 1188, the court determines that TechINT has made its claim exceeding $75,000 in good faith and reasonably could expect to recover the amount sought. Thus, the court concludes that it has subject matter jurisdiction over this case and proceeds to TechINT's motion for preliminary injunction.

**B. Motion for Preliminary Injunction**

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). Preliminary injunctive relief is an extraordinary remedy that courts should apply sparingly. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991). As a preliminary injunction temporarily affords an extraordinary remedy prior to trial that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by a "clear showing" that: (1) he is likely to succeed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v.*

*Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). All four of these requirements must be met for a plaintiff to obtain preliminary injunctive relief. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345–46 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).[5]

For purposes of a motion for preliminary injunction, the court may consider testimony offered at the preliminary injunction hearing as well as declarations and affidavits submitted by the parties. The Fourth Circuit has determined that a district court ruling on a preliminary injunction "may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017).

**1. Likelihood of success on the merits**

First, "plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20). "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial," *Real Truth*, 575 F.3d at 345, a plaintiff need not show a certainty of success, *see Pashby*, 709 F.3d at 321.

Here, TechINT has made a clear showing that it is likely to succeed on the merits of its breach of contract claim. To establish a breach of contract, TechINT must prove: (1) a legally enforceable obligation of Sasnett to TechINT, (2) Sasnett's violation or breach of that obligation; and (3) injury or damage to TechINT caused by the breach of obligation. *See Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004). With respect to the first element, the burden rests on TechINT

---

[5] TechINT argues that, despite the Supreme Court's decision in *Winter*, a strong proof of likelihood of success on the merits lessens its burden to show irreparable harm because "[c]ourts in the Fourth Circuit . . . have continued to apply this balance tipping test post-*Winter*." (Pl.'s Reply 23, Dkt. No. 21.) The cases to which TechINT cites, however, were decided before *Real Truth*, in which the Fourth Circuit rejected such a balancing test as inconsistent with *Winter*. 575 F.3d at 347.

to show that the restrictive covenant extends no greater than necessary to protect its legitimate business interests, is not unduly burdensome on Sasnett's ability to earn a living, and does not offend sound public policy. *See, e.g.*, *Landmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 528–29 (E.D. Va. 2006). Factors to be considered in this analysis include the function, geographic scope, and duration of the restriction, *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001), which the court should "assess . . . together rather than as distinct inquiries," *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012).

Sasnett first argues that the provision at issue is unenforceable because it is susceptible to interpretations of "client" and "competing services" that render it functionally overbroad. In particular, Sasnett argues that the restrictive covenant bars him from "providing any 'intelligence analysis' services to any governmental entities to which TechINT has ever marketed." (Def.'s Opp'n 2, Dkt. No. 19.) The court does not find this argument persuasive. Far from applying to "any governmental entities to which TechINT has ever marketed," section 4(a) limits "clients" to a) entities to which TechINT provided services during the 12 months preceding Sasnett's resignation, or b) entities "specifically targeted" by TechINT's marketing efforts—"not merely in the form of general marketing activities"—provided that Sasnett "was aware of and/or participated in such marketing efforts." Furthermore, although Sasnett argues that the provision restricts him from providing services to others that he did not actually perform for TechINT, that is not the relevant inquiry. The question turns not on what services he as the *employee* performed, but "whether the prohibited activity is of the same type as that actually engaged in by the former *employer*." *Home Paramount Pest Control Co. v. Shaffer*, 718 S.E.2d 762, 764 (Va.

2011) (emphasis added).[6] A valid provision, then, would prohibit "an employee from engaging in activities that would actually or potentially compete with the employee's former employer," but could not prohibit an employee from working for a competitor if he "engage[d] exclusively in activities that do not compete with the former employer." *Id.* at 764–65 (citations omitted) (reasoning that the provision at issue was valid where it did not forbid former employees "from working in *any* capacity for a medical equipment company" but only from roles which would compete with the employer's business).

Sasnett next argues that, even if the court determines the provision is enforceable, he has not violated it. Sasnett asserts that he has provided services to Red Six *customers* rather than to Red Six directly and that he never solicited other TechINT employees for employment at Red Six. TechINT conceded at the hearing that factual issues remain as to Sasnett's alleged solicitation of certain employees. But the court rejects Sasnett's attempt to distinguish Red Six customers from Red Six as an entity. His employment by Red Six unquestionably constitutes "providing services" to it, and not just to its clients. Furthermore, TechINT has submitted evidence that Sasnett has provided or is providing competing services to the following TechINT clients: Red Six, ELTA NA, the United States Marine Corps, the Combating Terrorism Technical Support Office, Cherokee Nation Strategic Programs, and the Canadian Special Forces. (Funicello Supp. Decl. ¶¶ 8–20.) The court concludes that TechINT has made, for preliminary injunction purposes, a clear showing that it is likely to succeed on the merits in that the restrictive covenant was a legally enforceable obligation held by Sasnett, that he violated that

---

[6] Sasnett relies heavily on two cases to argue that the provision here is overbroad and unenforceable: *Nortec Communications, Inc. v. Lee-Llacer*, 548 F. Supp. 2d 226 (E.D. Va. 2008), and *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524 (E.D. Va. 2006). To the extent those two cases are contrary to the result reached here, the court notes that both were decided before the decision in *Home Paramount*, in which the Supreme Court of Virginia clarified the proper inquiry. Additionally, the court finds them factually distinguishable in that both involved broader clauses than the provision at issue here.

obligation by providing competing services to TechINT clients, and that such provision of competing services damages TechINT. *See Filak*, 594 S.E.2d at 619. Thus, TechINT has satisfied the first requirement to obtain preliminary injunctive relief.

**2. Irreparable harm**

Second, *Winter* also requires that the party requesting injunctive relief demonstrate that it is likely it will suffer irreparable harm absent the preliminary injunction. 555 U.S. at 22–23. The harm to be prevented must be of an immediate nature and not simply a remote possibility. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d at 525. A plaintiff must overcome the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). The loss of goodwill or industry reputation "is a well-recognized basis for finding irreparable harm." *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 635 (W.D. Va. 2010). Courts in the Fourth Circuit have held that "loss of clients' goodwill and future business [is] difficult, if not impossible, to measure fully." *Fid. Global Brokerage Grp., Inc. v. Gray*, No. 1:10-cv-1255, 2010 WL 4646039, at *3 (E.D. Va. Nov. 9, 2010) (citation omitted).

TechINT has shown that it is likely to suffer irreparable harm in the absence of an injunction. Sasnett argues that the complaint alleges precise money damages as to TechINT's purchase order with Red Six, which establishes that any harm allegedly suffered can be remedied by money damages. And any alleged future loss of business is, according to Sasnett, too speculative. TechINT concedes that the value of the purchase order is quantifiable. Nevertheless, at the hearing, TechINT distinguished the harm caused by Sasnett's leaving, which it acknowledges was his right to do, from the harm caused by his alleged breach of contract.

11

TechINT has proffered evidence that Sasnett's experience with TechINT has been touted, both by Sasnett and by Red Six, to the benefit of Red Six. (*See, e.g.*, Sasnett LinkedIn profile 38, Dkt. No. 5-1; Red Six Announcement 19, Dkt. No. 21-1; Red Six Facebook 21, Dkt. No. 21-1; Red Six Twitter 24, Dkt. No. 21-1.) TechINT has also submitted emails written by Crino, Red Six's CEO, requesting additional work to be provided to Red Six by TechINT leading up to Sasnett's departure. (Crino Emails 7–18, Dkt. No. 21-1.) This evidence, together with the supplemental evidence regarding ELTA NA, the United States Marine Corps, the Combating Terrorism Technical Support Office, Cherokee Nation Strategic Programs, and the Canadian Special Forces—"[e]ach . . . a potential example of lost business . . . the amounts of which cannot be forecasted precisely," *Gray*, 2010 WL 4646039, at *3—sufficiently demonstrates that TechINT is likely to suffer irreparable harm absent the preliminary injunction.[7]

3. **Balance of equities**

Third, in considering a request for preliminary injunctive relief, a court must weigh the balance of equities between the parties. *See Winter*, 555 U.S. at 20; *see also Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("The purpose of . . . interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward.") (citation omitted).

The court finds that the balance of equities weighs in favor of TechINT. Sasnett argues that the balance of equities weighs in his favor because a preliminary injunction would have the effect of preventing him "from obtaining a new job in [his] field anywhere in the world for two (2) years." (Def.'s Opp'n 48.) But Sasnett's argument misrepresents the reach of both the restrictive covenant at issue and the preliminary injunctive relief TechINT seeks. *See* Section

---

[7] The court also notes Sasnett's acknowledgment of irreparable harm in Section 8 of the Agreement. (Servs. Agt. 7–8, Dkt. No. 5-1.)

12

II.B.1, *supra*. The court weighs the harm to Sasnett if he were prevented from providing competing services to or soliciting TechINT's clients—again, as both terms are elaborated upon above—against the likelihood of immeasurable, irreparable harm to TechINT absent preliminary injunctive relief. It concludes that the balance tips in TechINT's favor.

### 4. The public interest

Finally, before granting a motion for preliminary injunction, the court must find that such relief is in the public interest. *See Winter*, 555 U.S. at 20. The public has an interest in the enforcement of valid contracts, *Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC*, No. 5:15-cv-58, 2016 WL 1247220, at *31 (W.D. Va. Mar. 24, 2016), and in protecting the rights of local businesses, *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005).

The public interest supports a preliminary injunction in this case. Sasnett argues that, "[p]ut simply, it would never be in the public interest to enforce the non-solicitation provision at issue in this action since it presents a case study in the type of restrictions on trade and employment that are unenforceable under Virginia law." (Def.'s Opp'n 49.) But, as noted above, the court has determined that, despite Sasnett's arguments regarding the enforceability of the restrictive covenant, TechINT has demonstrated a likelihood of success on the merits. Enforcing compliance with a non-solicitation provision that is not functionally overbroad and protecting TechINT's business interests are within the public interest. Thus, TechINT has satisfied all four *Winter* factors, and the court will grant its motion for preliminary injunction.

### 5. Remedy

As a remedy, TechINT seeks to preliminarily enjoin Sasnett from violating the parties' Agreement by providing competing services to TechINT's clients, to include enjoining Sasnett from providing UAS-related and other services to Red Six Solutions, LLC, and enjoining him

from soliciting employees of TechINT to terminate their employment with TechINT. Additionally, TechINT asks this court to require Sasnett to account for and immediately return to TechINT all property, equipment, information, and materials belonging to TechINT, along with all information and materials created by Sasnett or acquired by Sasnett during his employment with TechINT. It also asks for an order requiring Sasnett to provide an accounting of all work, proceeds, and profits related to work or services he has provided since his resignation from TechINT, and further requiring Sasnett to disclose the identity of all third parties for whom he has performed competing services or contacted concerning the provision of competing services.

The court will enjoin Sasnett from providing competing services to TechINT's clients, to include enjoining Sasnett from providing UAS-related and other services to Red Six Solutions, LLC, and enjoin him from soliciting employees of TechINT to terminate their employment with TechINT. The court, however, will not require Sasnett to account for and return of property as the evidence at the hearing did not indicate a failure to return property. Furthermore, the court will not, at this time, require Sasnett to provide an accounting of all work, proceeds, and profits or to identify all third parties for whom he has performed competing services because TechINT may seek this information through the discovery process in this case.

6. **Bond**

Rule 65(c) of the Federal Rules of Civil Procedure directs that a court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Fourth Circuit has explained that this rule "is mandatory and unambiguous," *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999), and so a district court's "[f]ailure to require a bond before granting preliminary injunctive relief

is reversible error." *Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 (4th Cir. 1992). The amount of the bond, however, is within the court's discretion, and the court may even choose to set the bond amount at zero in an appropriate case. *Id.* at 1483 n.23.

In this case, neither party has provided any evidence or argument as to an appropriate amount of the bond if the court were to grant the preliminary injunction. Moreover, in their agreement, the parties waived the requirement that a bond be set for any preliminary or permanent injunction. (Servs. Agt. § 8, Dkt. No. 22-4 ("The parties agree that such relief will be available without the necessity of posting bond.").)

In the absence of more information, and given Sassnet's contractual waiver of the bond requirement, the court will set a nominal bond of $200 at this time, and the relief ordered in this preliminary injunction will be effective as of the posting of that bond with the clerk of this court. In the event that additional information is presented to the court regarding the damages likely to be sustained by Sassnet "if he is found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), the court may reconsider the bond amount.

III. CONCLUSION

For the reasons stated above, TechINT's motion for preliminary injunction as to its breach of contract claim (Dkt. No. 4) is GRANTED IN PART and DENIED IN PART as to certain remedies requested by TechINT. It is hereby ORDERED that, pending the outcome of this litigation, defendant Brandon Sasnett, as well as his officers, agents, servants, employees, attorneys, and anyone acting in active concert or participation with any of those persons, are hereby ENJOINED from:

1. Providing competing services (on his own behalf or on behalf of others), as defined in Section 4a of the Services Agreement, to TechINT's clients, as defined in Section 4a of the

Services Agreement, including, but not limited to, Red Six Solutions, LLC; and

      2. Soliciting employees of TechINT (on his own behalf or on behalf of others), as defined in Section 4c of the Services Agreement, to terminate their employment with TechINT.

This order shall be effective only after TechINT has obtained and posted with the clerk of the court a certified surety bond in the amount of two hundred dollars ($200.00).

The clerk is directed to send a copy of this memorandum opinion and order to all counsel of record.

Entered: September 27, 2018.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge