CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

10/7/2019

JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| TECHINT SOLUTIONS GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:18-cv-00037 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| BRANDON SASNETT, *et al.*, | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This matter is before the court on TechINT Solutions Group, LLC's (TechINT) motion for partial summary judgment against defendants Brandon Sasnett and Scott Crino on Counts I (Sasnett), II (Sasnett and Crino), and VI (Sasnett) (Dkt. No. 157), and Crino's motion for partial summary judgment against TechINT on Counts IV, V, and VI (Dkt. No. 191). The court heard oral argument on TechINT's motion on June 11, 2019, and took the matter under advisement. On September 26, 2019, the court heard oral argument on Crino's motion and took that matter under advisement.[1] For the reasons set forth below, the court will grant in part and deny in part TechINT's motion for partial summary judgment and will grant in part and deny in part Crino's motion for partial summary judgment.

---

[1] Also scheduled for hearing on September 26, 2019, were TechINT's motion for partial summary judgment against Crino on Crino's affirmative defenses (Dkt. No. 189), and Crino's motion to exclude Craig "Skip" Funicello as an expert witness (Dkt. No. 193). At the hearing, counsel for Crino consented to the entry of an order granting TechINT's motion for partial summary judgment as to the affirmative defenses included in TechINT's motion (TechINT did not seek summary judgment on Crino's defense that the intracorporate immunity doctrine applies to TechINT's conspiracy claim). The parties also agreed that neither Funicello nor Crino would testify as experts. Accordingly, the court granted both motions by oral order. (Dkt. No. 213.)

## I. BACKGROUND

In broad terms, this case involves claims by an employer, TechINT,[2] against its former employee, Sasnett, who left its employ and was immediately thereafter employed by Red Six, a customer of TechINT's. TechINT hired Sasnett in September 2013 as an Intelligence Analyst working with unmanned aircraft systems (UAS). (Funicello Aff. ¶ 10, Dkt. No. 5-1.) On January 1, 2016, TechINT entered several contracts with Sasnett by which Sasnett received a 2% membership interest in the LLC. (*Id.* ¶ 11; TechINT Dep. 37, Dkt. Nos. 192-2, 199-6.)[3] One of those agreements, the Services Agreement, contained a restrictive covenant that largely forms the basis of this dispute. (Funicello Aff. ¶ 12.)

While Sasnett worked at TechINT, the company provided UAS services as a subcontractor to several government contractors, including Red Six Solutions, LLC (Red Six). (*Id.* ¶ 26; TechINT Dep. Ex. 3, Dkt. No. 192-2.) TechINT also pursued additional agreements with several other entities. (Funicello Supp. Decl. ¶¶ 8–20, Dkt. No. 40-1 (including "the agency," ELTA NA, USMC, Cherokee Nation, Combating Terrorism Technical Support Office, Battelle, and Canadian Special Forces).) According to TechINT, Sasnett and his fellow UAS employee, Archie Stafford,[4] oversaw TechINT's provision of UAS services and were tasked with growing TechINT's UAS-related business. (Funicello Aff. ¶ 13.)

---

[2] TechINT is a Virginia LLC that provides services as a federal government contractor, "including threat systems analysis, operational support and training, intelligence analysis, counter terrorism training and consulting, and forensic intelligence services." (Am. Compl. 3, Dkt. No. 120.)

[3] The parties each filed piecemeal copies of various depositions as exhibits to their motions. For the sake of clarity, the court's citations will be to the depositions' original page numbers, but first mentions of each deposition will contain citations to each docket number where relevant portions of the deposition transcripts may be found.

[4] Shortly after Sasnett resigned from TechINT and started working at Red Six, Stafford followed. He resigned from TechINT on November 14, 2017, and started working as a contractor for Red Six in January 2018. (Stafford Dep. 12–16, Dkt. Nos. 192-9, 199-10.)

On October 11, 2017, Sasnett resigned from TechINT. (Sasnett Dep. 268, Dkt. Nos. 192-1, 199-2; Sasnett Dep. Ex. 17, Dkt. No. 192-1.) Prior to his resignation, on October 10, 2017, Sasnett texted Crino, Red Six's CEO, asking, hypothetically, whether Red Six would consider hiring someone "with [Sasnett's] exact experience and background" if they "suddenly became available on the market," to which Crino answered, "absolutely." (Red Six Dep. Ex. 14, Dkt. No. 192-6.) According to Crino, this was the first time Sasnett had ever expressed to Crino an interest in leaving TechINT. (Def. Mot. Summ. J. 6, Dkt. No. 192.) The day Sasnett resigned, he texted Crino to tell him he was a "free agent." (Red Six Dep. Ex. 14.) Sasnett accepted a job offer and started his employment with Red Six on October 17, 2017.[5] (Sasnett Dep. 273.)

Shortly after Red Six hired Sasnett, TechINT advised Crino that Sasnett had a Services Agreement that barred him, for a term of two years after his employment with TechINT ended, from providing the same services TechINT provided to its actual clients and certain prospective clients and also barred him from soliciting TechINT employees. (Crino Dep. 8–9, Dkt. Nos. 192-7, 199-11.) Even after Crino learned of that agreement and received a copy of it, however, Red Six continued to employ Sasnett. (*See* Def. Mot. Summ. J. 10 ("Sasnett ceased being a Red Six employee on August 28, 2019.").) Red Six immediately cancelled its own purchase order with TechINT (Red Six Dep. 78–79), and Red Six and Sasnett began doing work for some of TechINT's clients or prospective clients (*see, e.g.*, *id.* at 140 (noting that Stafford, Sasnett, and Crino, among others, provided UAS services to ELTA)).[6]

_____

[5] Between his resignation from TechINT and his start date with Red Six, Sasnett and former TechINT president Kevin Lutz formed their own company, LCS Defense, Inc., to serve as a "placeholder" business. (Sasnett Dep. 97, 159.)

[6] The parties spend substantial portions of their briefs discussing the services that TechINT and Red Six provided to several shared or potential clients. (*See* Def. Mot. Summ. J. 4–5, 8; Pl. Br. Opp. 5–10, Dkt. No. 199.) Other than Sasnett's work for Red Six, the court need not delve into the specific facts regarding those services at this time. The parties generally dispute to what extent Red Six caused a loss of TechINT's business expectancies, which is a necessary element of several claims at issue here. As the Fourth Circuit has recently stated, establishing a valid

TechINT then filed the present lawsuit asserting the following claims:[7]

<blockquote>

Count I:   a breach of contract claim for breach of the Services Agreement (against Sasnett only);

Count II:  tortious interference with contract and business expectancies (against Sasnett and Crino);

Count III: conversion (against Sasnett only);

Count IV: conspiracy (against Sasnett and Crino);

Count V:  breach of fiduciary duty and aiding and abetting breach of fiduciary duty (against Sasnett and Crino); and

Count VI: injunctive relief enforcing the terms of Sasnett's Services Agreement and ordering all defendants to "cease any further unlawful activity."

</blockquote>

(Am. Compl., Dkt. No. 120.) As stated above, TechINT filed its motion for partial summary judgment against Sasnett and Crino seeking judgment on counts I, II, and VI (against Sasnett only), and Crino filed his motion for partial summary judgment against TechINT as to counts IV, V, and VI.

## II. DISCUSSION

### A.   Standard of Review

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

---

business expectancy is a fact-intensive inquiry, *L-3 Comms. Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th Cir. 2019), and the court cannot determine on the heavily disputed facts of this case whether a valid business expectancy arose as to the numerous entities discussed here.

[7] TechINT also included claims against Red Six, but the court dismissed Red Six as a party by order entered June 17, 2019. (Dkt. No. 170.)

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

**B.      Crino's Motion for Partial Summary Judgment as to Counts IV–VI**

Crino moves for summary judgment on the Counts of conspiracy, aiding and abetting Sasnett's breach of fiduciary duty, and injunctive relief.

**1.  Conspiracy (Count IV)**

TechINT claims Crino should be liable for damages stemming from a conspiracy in which Sasnett, Red Six, Crino, and Stafford acted in concert and intentionally to harm TechINT's business. As a preliminary matter, Crino argues that, to the extent TechINT's conspiracy claim arises from actions taken after Sasnett began working for Red Six, it is barred by the intracorporate immunity doctrine. The court agrees and will therefore consider TechINT's conspiracy claim only in relation to actions taken prior to Sasnett's and Stafford's employment with Red Six.

Under the intractorporate immunity doctrine, "acts of corporate agents are the acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002); *NorthStar Aviation, LLC v. Alberto*, 332 F. Supp. 3d 1007, 1017 (E.D. Va. 2018) ("Virginia law makes clear that because a corporation and its agents are essentially one actor, 'a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility.'"). In a prior memorandum opinion, the court already considered to what extent this theory applies to TechINT's claim. (Mem. Op. Crino Mot. to Dismiss 5–6, Dkt. No. 172.) However, TechINT now asserts that the alleged conspiracy falls into an exception to intracorporate immunity.

Two exceptions are relevant here. Specifically, the doctrine does not apply where a company's agents act outside the scope of their employment, *see Darton Envtl., Inc. v. Fjuvo Collections, LLC*, 332 F. Supp. 3d 1022, 1035 (W.D. Va. 2018), or where one of the conspirators has an "independent personal stake in achieving the corporation's illegal objective," *Selman v. Am. Sports Underwriters, Inc.*, 697 S. Supp. 225, 239 (W.D. Va. 1988) (citing *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985)). *But see Phoenix Renovation Corp. v. Rodriguez*, 461 F. Supp. 2d 411, 429 (E.D. Va. 2006) ("Virginia has not recognized the so-called 'personal stake' exception to this general rule . . . ."). Relying on these exceptions, TechINT argues that Crino acted outside the scope of his employment and with a personal financial stake in the outcome of the conspiracy.

TechINT first points to Red Six's "Core Values" as proof that Crino's actions exceeded his role at Red Six. (*See* Pl. Br. in Opp. 14 ("According to Crino, the Core Values include

respecting a third party's contracts." (citing Red Six Dep. 37–43)).)  Because Crino violated the

Core Values by ignoring Sasnett and Stafford's restrictive covenants, TechINT contends he acted

outside the scope of his employment.  However, as a mere aspirational code of conduct, the Core

Values do not strictly define Crino's role as CEO of Red Six.  Indeed, by pursuing opportunities

to grow Red Six's client base and increase revenue, Crino and Sasnett assuredly acted within the

scope of their employment with Red Six.  TechINT has not identified any facts or case law to the

contrary.[8]

Similarly, TechINT has not pointed to any facts indicating that Crino acted with a

sufficiently personal motive.  TechINT's argument hinges on its allegations that as a result of the

conspiracy, Red Six and Crino would see an increase in profits.  However, the Fourth Circuit has

limited the personal-stake exception to situations "where a co-conspirator possesses a personal

stake *independent of his relationship to the corporation*."  *ePlus Tech., Inc.*, 313 F.3d at 179

(emphasis added); *see also Selman*, 697 F. Supp. at 239 ("Certainly, under the most permissive

interpretation of its language, an employee or agent of a corporation would always meet the

exception since he would surely have an independent personal stake in the health and

profitability of the corporation.  Such an interpretation is overbroad.").  Although Crino, as CEO

and majority owner of Red Six, would certainly stand to gain financially from any alleged

conspiracy to usurp TechINT's business, this benefit stems directly from Crino's relationship to

Red Six.  That Crino sought to increase the profitability of a company in which he holds a

majority ownership cannot suffice to establish the personal stake necessary to bar application of

the intracorporate immunity doctrine.[9]

---

[8] At the hearing on Crino's motion for summary judgment, counsel for TechINT correctly noted that an employer may terminate an employee for violating the employer's core values or mission statement; however, that is not the situation here.

[9] TechINT further suggests "Sasnett had the purely personal motive of 'crushing' TechINT."  (Pl. Br. in

Accordingly, to the extent TechINT alleges a conspiracy between Crino and Sasnett or Stafford during the period in which Sasnett and/or Stafford were employees of Red Six, TechINT's claim is barred by the intracorporate immunity doctrine.

      *b. Conspiracy prior to Sasnett's employment with Red Six*

Virginia allows recovery for civil conspiracy where "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of . . . willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Va. Code §§ 18.2-499, 18.2-500. To succeed on a conspiracy claim, a plaintiff must prove "(1) concerted action; (2) legal malice; and (3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007).

Crino contends that there was no "meeting of the minds" necessary to prove concerted action. To establish concerted action, TechINT must show that Crino and at least one other person "combined together to effect a preconceived plan and unity of design and purpose." *Schlegel*, 505 F. Supp. 2d at 326; *see also AWP, Inc. v. Commonwealth Excavating, Inc.*, No. 5:13cv031, 2013 WL 3830500, at *2 (W.D. Va. July 24, 2013) (requiring a plaintiff to establish a "preconceived plan and unity of design and purpose, for the common design is the essence of the conspiracy"). As the court noted in a prior opinion in this case, "[g]iven the nature of a

---

Opp. 20.) Here, Sasnett may have enjoyed seeing his former employer suffer losses, but it is unlikely this is the type of personal motive to which the exception should apply. In *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696 (4th Cir. 1991), the Fourth Circuit rejected an argument that alleged conspirators had personal stakes because their own businesses would benefit if the plaintiff was eliminated as a competitor. *Id.* at 705 (discussing an alleged conspiracy between medical staff at a hospital to oust another staff physician where only one of the alleged conspirators could have benefitted from the conspiracy's success). The court warned that "this exception has expanded and in the process has been criticized for, among other things, becoming an exception that threatens to swallow the rule." *Id.* Moreover, without some shared intent or agreement to harm, Sasnett's personal motive does not necessarily implicate Crino as a conspirator. TechINT emphasizes the rule in Virginia that only one party to the conspiracy need engage in the underlying tortious act. *See L-3 Comms. Corp.*, 926 F.3d at 92. However, this does not eliminate the need for an actual conspiracy—an agreement or concerted activity. Even if Sasnett had a personal stake here, that merely establishes that Sasnett may have conspired with Red Six. It does not weigh at all on Crino's ability to conspire with Red Six.

conspiracy . . . often the evidence of agreement or concerted action 'may be inferred from the things actually done.'" (Mem. Op. Crino Mot. to Dismiss 6 (quoting *Frey & Son, Inc. v. Cudahy Packing Co.*, 256 U.S. 208, 219 (1921)).) However, this court has also previously refused to adopt a "but-for" test to establish concerted action. *See Schlegel*, 505 F. Supp. 2d at 327 ("[T]o read a 'but for' test of 'conspiracy' and 'concerted action' into Virginia's civil conspiracy statute would mean that two people acting independently would be civilly liable any time their independent acts resulted in a harm . . . regardless of whether the two people actually came to an agreement . . . regarding the purpose of their actions.").

Crino notes that he did not know of Sasnett's desire to leave TechINT until Sasnett's October 10, 2017 text message. Thus, he argues that he could not have conspired with Sasnett until after that date. Crino further asserts that he never discussed harming TechINT or taking its business with Sasnett or anyone else, that Sasnett did not disclose his restrictive covenant in his interview with Red Six, and that Crino did not know about either the restrictive covenant or Sasnett's membership interest in TechINT. (*See* Def. Mot. Summ. J. 13–14 (citing facts in the record that support Crino's position).)

TechINT nonetheless attempts to shoehorn facts into its conspiracy argument that do not directly establish concerted action on Crino's behalf. Specifically, TechINT points out that Crino hoped to grow Red Six so that he could stop "outsourcing" work and knew Sasnett was "well-known in the industry" as a UAS specialist. (Red Six Dep. 121–22, 150.) Crino also asked Sasnett to introduce him to contacts for the United States Marine Corp—one of TechINT's potential clients—and approached Sasnett for technical input on a proposal intended to obtain future work for Red Six.[10] (Sasnett Dep. 78–83.) Additionally, Crino stated that he saw

---

[10] TechINT makes much of Sasnett introducing Crino to multiple potential clients while he still worked for TechINT. Notably, however, Red Six had previously hired TechINT to provide UAS services. Given that context,

Sasnett's resignation as an opportunity to advance Red Six. (Dreby Dep. 18–19, Dkt. Nos. 199-9, 192-8.) TechINT further highlights a discussion regarding a mutual client of Red Six and TechINT at Sasnett's interview—TechINT quotes Crino as asking "how *we* could support the client." (Red Six Dep. 134.)

However, the facts further indicate that Sasnett resigned from TechINT and started a business with prior TechINT president Kevin Lutz as a placeholder—an indication that Sasnett and Crino were not engaged in a conspiracy that began prior to Sasnett's resignation. And, until Red Six hired Sasnett, Sasnett was applying to jobs with other companies. (Sasnett Dep. 265.)

Accordingly, it appears TechINT relies on a but-for argument in support of its conspiracy claim. It cannot point to a specific agreement between the parties or shared purpose to harm TechINT. Rather, TechINT's argument seems to be that because Crino wanted Red Six to grow and knew of Sasnett's experience in the UAS field and the common industry practice of imposing restrictive covenants, his hiring of Sasnett after Sasnett asked about a hypothetical job opening must indicate concerted action between the two. Such an argument is simply too tenuous to support a claim of conspiracy at this stage of the proceedings. TechINT may not rely on its mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Even taking the facts in the light most favorable to TechINT, TechINT has failed to establish that Crino and Sasnett or any other individual agreed or acted in concert to harm TechINT.[11]

---

many of the interactions TechINT highlights as conspiratorial appear innocent. For example, if Sasnett introduced Red Six to potential customers while employed with TechINT, and Red Six relied on TechINT to provide UAS services, Sasnett's networking would increase the number of contracts available to TechINT through Red Six. Thus, it appears that until Sasnett resigned, the complained-of actions were, at least to some extent, in furtherance of TechINT's business.

[11] At the hearing, TechINT also suggested Crino may have conspired with Stafford to recruit Stafford away from TechINT. Notably, however, Stafford is not named as a defendant to TechINT's conspiracy claim, and TechINT has not identified facts indicating that Crino had much, if any, dealing with Stafford prior to Stafford's

TechINT argues that *L-3 Communications Corp. v. Serco, Inc.*, 926 F.3d 85 (4th Cir. 2019), and *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.*, 453 S.E.2d 261 (Va. 1995), support its claim here. Its reliance on these cases is misplaced. In *L-3 Communications*, the court reversed a district court's holding that the plaintiff's conspiracy claims were time barred and that the plaintiff failed to establish a valid business expectancy. *L-3 Comms.*, 926 F.3d at 92–96. It did not weigh in on the extent to which a plaintiff must show an agreement, concerted action, mutual undertaking, or any other association between alleged conspirators. And, although the court in *Bellsouth* ultimately found that "[t]he evidence shows that [the defendants] unlawfully conspired to injure [the plaintiff] in its business" through a bribery scheme intended to steer business away from the plaintiff, similar evidence is absent here. *Bellsouth*, 453 S.E.2d at 267.

Because TechINT has not set forth specific facts indicating that Crino engaged in concerted action, it cannot succeed on its conspiracy claim as a matter of law. Accordingly, the court need not consider the remaining elements of conspiracy and will grant Crino's motion for partial summary judgment as to TechINT's conspiracy claim.

### 2. Aiding and abetting breach of fiduciary duty (Count V)

Crino next challenges TechINT's claim that Crino aided and abetted Sasnett's breach of fiduciary duties. In a prior opinion, the court held that this tort exists as "a viable alternative theory to secure joint liability." (Mem. Op. Crino Mot. to Dismiss 8 (quoting *All. Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12CV701-HEH, 2013 WL 143500, at *4–5 (E.D. Va. Jan. 11, 2013)).) Breach of a fiduciary duty consists of (1) duty, (2) breach of that duty, and (3) damages

---

employment with Red Six. Rather, TechINT noted that *Sasnett* texted Stafford about joining TechINT and recommended Crino hire Stafford. Thus, to the extent TechINT seeks to hold Crino liable for a conspiracy with Stafford, it has similarly failed to overcome its burden to show a genuine issue for trial.

proximately caused by that breach. *St. Paul Fire & Marine Ins. Co. v. Hoskins*, No. 5:10-cv-87, 2012 WL 748574, at *5 (W.D. Va. Mar. 7, 2012). "Virginia law allows a third party to be liable for another party's breach of fiduciary duty when that third party knowingly participated in the breach."[12] *AvalonBay Cmtys., Inc. v. Wilden*, No. 1:08-cv-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009), aff'd, 392 F. App'x 209 (4th Cir. 2010).

As relevant here, an employee continues to owe a fiduciary duty of loyalty to his employer even after resignation or termination. *See All. Tech. Grp., LLC v. Achieve 1, LLC*, No. 3:12CV701-HEH, 2013 WL 143500, at *4–5 (E.D. Va. Jan. 11, 2013) ("A plaintiff may demonstrate such a breach by alleging that the employee 'misappropriated trade secrets, misused confidential information, [or] solicited an employer's clients or other employees prior to termination of employment.'" (alteration in original) (quoting *Williams v. Dominion Tech. Partners, LLC*, 576 S.E.2d 752, 757 (Va. 2003))); *Today Homes, Inc. v. Williams*, 634 S.E.2d 737, 744 (Va. 2006) ("It is true that '[r]esignation or termination does not automatically free a director or employee from his or her fiduciary obligations.'" (alteration in original) (quoting *T.A. Pelsue Co. v. Grand Enters, Inc.*, 782 F. Supp. 1476, 1485 (D. Colo. 1991))). "A former employee may breach his duty to a former employer if the conduct began during employment or if post-termination competition is 'founded on information gained during the [employment] relationship.'" *All. Tech. Grp., LLC*, 2013 WL 143500, at *4 (alteration in original) (quoting *Today Homes, Inc.* 634 S.E.2d at 744).

Although Crino does not dispute that Sasnett may have breached a fiduciary duty to TechINT, he contends that the facts do not establish his knowledge of or participation in the

---

[12] Crino argues that he did not have the requisite mens rea, which he argues "requires that a party have a guilty mind and an intent to commit the prohibited act." (Def. Mot. Summ. J. 18). However, the standard here is whether Crino *knowingly* participated. *AvalonBay Cmtys., Inc. v. Wilden*, No. 1:08-cv-777, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009), aff'd 392 F. App'x 209 (4th Cir. 2010).

breach.  Taking the facts in the light most favorable to TechINT, however, there exists a genuine issue of material fact as to this claim.  Accordingly, the court must deny Crino's motion for summary judgment as to TechINT's Count V.

While the fiduciary duty at issue here does not necessarily arise from Sasnett's Services Agreement with TechINT, Crino's knowledge of that agreement is nonetheless helpful in considering Crino's knowledge of and participation in any breach of fiduciary duties.[13]  Crino acknowledges that he learned of Sasnett's services agreement on November 1, 2017, as part of a correspondence from TechINT that outlined which services the agreement prohibited Sasnett from providing.  (Crino Dep. 8–9.)  Crino already knew as CEO of Red Six that Sasnett provided UAS services to Red Six while employed at TechINT.  As of November 1, 2017, he also knew what services Sasnett provided in that role.  In effect, the correspondence put Crino on notice that TechINT expected Sasnett to refrain from providing similar services to Red Six.  Nonetheless, Sasnett remained with Red Six until August 2019.  (Def. Mot. Summ. J. 10.)

While it is unclear whether Crino had actual knowledge of Sasnett's fiduciary, rather than contractual, duties, TechINT has nonetheless met its burden to show that a genuine issue for trial exists on this issue.  Additionally, TechINT has presented sufficient evidence to place into doubt whether Sasnett's continuation of services to Red Six upon his termination from TechINT resulted in a loss of business expectancy.  To the extent TechINT's loss of business expectancy resulted from Crino's knowing participation in Sasnett's breach, Crino may be liable for resulting damages.  Accordingly, the court will deny Crino's motion for summary judgment as to

---

[13] On this point, both parties appear to misplace their focus on Sasnett's breach of the Services Agreement rather than any fiduciary duty.  For example, Crino argues that he did not have the knowledge necessary to aid or abet in part because he "had no idea initially that Sasnett was subject to restrictive covenants or that he was being accused of taking TechINT property."  (Def. Mot. Summ. J. 17.)  For its part, TechINT states that "Crino should have known from his experience . . . that Sasnett was a key TechINT employee.  Crino also admitted that employment agreements are common in the industry."  (Pl. Br. in Opp. 22.)

Count V.

### 3. Permanent injunctive relief (Count VI)

Finally, Crino seeks summary judgment on TechINT's claim for permanent injunctive relief. He argues that the amended complaint does not request any injunctive relief from Crino or Stafford. He further argues that the court cannot enjoin him without enjoining a non-party—Red Six.

In fact, the amended complaint requests an injunction requiring "Defendants to cease any further unlawful activity." (Am. Compl. 22.) Although Stafford is not a named defendant, Crino clearly falls under the category of "Defendants."

Moreover, the court already addressed Crino's argument that an injunction would improperly enjoin a non-party. Admittedly, the court stated "there is a slim possibility of a potential for inconsistent injunctions," as Crino suggests. (Mem. Op. Red Six Mot. to Dismiss 8, Dkt. No. 169.) However, the court continued, saying that "if it finds in favor of TechINT, it can draft any injunctive relief in this case in a way that will protect or vindicate TechINT's interests without directly enjoining Red Six." (*Id.*) Accordingly, the court will deny Crino's motion as to Count VI.

*     *     *

Based on the above, the court finds that genuine issues of material fact exist as to counts V and VI. The court agrees with Crino, however, that TechINT has identified insufficient facts to support its conspiracy claim. Accordingly, the court will grant Crino's motion for partial summary judgment as to Count IV.

### C. TechINT's Motion for Partial Summary Judgment on Counts I–II and VI

Also pending before the court is TechINT's motion for partial summary judgment as to

Count I against Sasnett for breach of contract, Count II against both Sasnett and Crino for tortious interference with contract and business expectancies, and Count VI against Sasnett for permanent injunctive relief. Notably, Sasnett did not file a response to TechINT's motion and did not identify evidence at the hearing on this motion that would place any material facts in dispute. Nonetheless, the court must review the motion to "determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993).

### 1. Breach of contract (Sasnett)

TechINT asserts that Sasnett breached his services agreement and, specifically, the restrictive covenants set out therein, by providing competing services to Red Six and several other TechINT clients and by soliciting Stafford to work for Red Six. (Pl. Mot. Summ. J. 10–15, Dkt. No. 158.) To establish breach of contract, TechINT must prove: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004).

With regard to the first element, TechINT must show that the restrictive covenant is no more restrictive than necessary to protect its legitimate business interest, does not unduly oppress the employee's legitimate efforts to earn a living, and does not violate public policy. *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962). This requires the court to consider the "function, geographic scope, and duration" of the restriction, *Simmons v. Miller*, 544 S.E.2d 666, 678 (Va. 2001), which the court should "assess . . . together rather than as distinct inquiries," *Preferred Sys. Sols. Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012).

TechINT asserts that the court has already determined that the restrictive covenant in the

services agreement is enforceable against Sasnett. (Prelim. Inj. Mem. Op. 8–11, Dkt. No. 99.) However, it did so in ruling on TechINT's motion for a preliminary injunction, at which point the court needed to determine only whether TechINT was *likely* to succeed on the merits of its breach of contract claim. Nonetheless, since the court's prior ruling, Sasnett has not raised any additional legal challenges to the restrictive covenant or identified any facts bearing on the court's decision. After a brief review of the restrictive covenant here, the court finds it is, in fact, enforceable against Sasnett.

The Agreement provides in pertinent part:

**4.**      **Non-Solicitation.**  Sasnett agrees as follows:

a.      <u>Non-Solicitation and Non-Service of Clients.</u>  During the Term[14] and the Restricted Period, Sasnett shall not, on his own behalf or on behalf of any other person or entity (except the Company), whether in the capacity of an owner, shareholder, member, partner, officer, employee, director, manager, independent contractor or otherwise, solicit to provide or provide any Competing Services to any Client of the Company. The term "Client" as used herein means (i) any entity, including without limitation, any government department, agency or division, for which the Company has performed any services in any capacity (including as a Prime contractor and/or subcontractor) at any time during the twelve (12) month period immediately preceding the Termination Date (defined below); or (ii) any entity, including without limitation, any government department, agency or division, to which the Company has marketed any of its services to at any time prior to the Termination Date; provided that (1) the Company's marketing efforts were specifically targeted to such entity and were not merely in the form of general marketing activities such as running an advertisement in an industry publication; and (2) Sasnett was aware of and/or participated in such marketing efforts. The term "Competing Services" are any services that are provided, offered or marketed by the Company at any time during the Term, including without limitation, intelligence analysis and Counter IED services.  The "Restricted Period" is the 2-year period immediately following the Termination Date.

\*\*\*\*

---

[14]   "The Company's engagement of Sasnett shall be on an at-will basis, and the Company may terminate this Agreement and Sasnett's engagement . . . at any time and for any reason, or for no reason.  The engagement of Sasnett pursuant to the terms of this Agreement shall commence effective as of January 1, 2016 and shall continue until terminated as set forth in Section 9 below."  (Servs. Agreement ¶ 2, Dkt. No. 5-1.)

c.  Non-Solicitation and Non-Hiring of Personnel.  During the Term of this Agreement and during the Restricted Period, Sasnett shall not, on his own behalf or on behalf of any other person or entity, solicit for employment or hire, or assist in the solicitation or hiring of, any member, employee or contractor who worked for the Company during the twelve (12) month period immediately preceding the Termination Date. This restriction includes without limitation, providing to any prospective employer the identities of any of the members, employees or contractors of the Company, or assisting any of the members, employees or contractors of the Company in obtaining employment with Sasnett or any other person or entity through dissemination of resumes or otherwise.

****

e.  Reasonableness of Restrictive Covenants.  Sasnett acknowledges that Sasnett could harm the legitimate and protectable business interests of the Company if Sasnett breaches any of the provisions of this Section 4.  The parties mutually agree that the terms and restrictions set forth in this Section 4 are reasonable in light of relevant factors and circumstances, and Sasnett specifically acknowledges and agrees that the restrictions set forth in this Section 4 are reasonable in terms of scope, duration, lack of geographic restriction, and the respective interests of the parties.  Moreover, Sasnett agrees that the terms and restrictions are: (i) no greater than necessary to protect the Company's legitimate and protectable business interests, (ii) not unduly harsh in curtailing Sasnett's efforts to earn a livelihood, and (iii) consistent with sound public policy.

****

**8.  Remedies.**  Any breach of the terms of Sections 4, 5, 6, or 7 of this Agreement shall be a material breach of this Agreement.  In view of the nature of the activities in which Sasnett is engaged, Sasnett acknowledges that any violation of Sections 4, 5, 6, or 7 of this Agreement would result in irreparable harm to the Company.  Sasnett therefore acknowledges that, in the event of violation of any of Sections 4, 5, 6, or 7 of this Agreement, the Company shall be entitled to obtain from any court of competent subject matter jurisdiction preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits and other benefits arising from such violation, which right shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled.  The parties agree that such relief will be available without the necessity of posting bond.  If the Company brings any action to enforce its rights under Sections 4, 5, 6, or 7 of this Agreement, it shall be entitled to recover its costs, including its reasonable attorneys' fees, incurred during litigation, mediation, negotiation or arbitration relating to any alleged breach.

(Servs. Agreement 3–4, 7–8, Dkt. No. 5-1.)

First, the agreement is sufficiently narrow such that it protects TechINT's legitimate

business interests while not overly burdening Sasnett's ability to find employment within the same field. Specifically, it forbids Sasnett from providing services to entities to which TechINT provided services within one year of Sasnett's resignation or entities "specifically targeted" by TechINT's marketing efforts, provided that Sasnett "was aware of and/or participated in such marketing efforts." As TechINT points out, "Sasnett is *only* prohibited from providing, or soliciting to provide, services which TechINT *actually* provided or *actually* solicited to provide its clients over the past 12 months." (Pl. Mot. Summ. J. 11.) This accords with the rule in Virginia that a valid restriction may prohibit "an employee from engaging in activities that would actually or potentially compete with the employee's former employer." *Home Paramount Pest Control Cos., Inc. v. Shafer*, 718 S.E.2d 762, 765 (Va. 2011).

Second, while the restrictive covenant does not include an express geographic scope, it is directly related to TechINT's actual clients or specifically solicited clients. *See Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827 (E.D. Va. 2011) ("Although the absence of a geographical limitation must be considered in evaluating whether a non-compete provision is enforceable, the lack of such a limitation does not, in itself, render the non-compete provision unenforceable." (citing *Simmons*, 544 S.E.2d at 678)). Because the agreement restricts Sasnett from providing services to specific entities—many of whom are federal government contractors—the lack of geographic scope is not unreasonable here. *See id.* (acknowledging the "global reach" of the employer's business in a niche market).

Third, as TechINT points out, Virginia courts have previously enforced restrictions with temporal limitations exceeding the two-year restriction at issue here. *See, e.g.*, *Roanoke Eng'g Sales Co., Inc. v. Rosenbaum*, 290 S.E.2d 882, 887 (Va. 1982) (enforcing a thirty-month restriction). Considered in conjunction with the geographic scope and function of the agreement,

the court finds that the two-year limitation is appropriate here. As mentioned above, Sasnett has not argued otherwise.

Additionally, the agreement between Sasnett and TechINT does not violate public policy. To the contrary, the confidential and proprietary nature of Sasnett's employment with TechINT supports a more restrictive non-competition clause. *See, e.g.*, *Brainware*, 808 F. Supp. 2d at 827 (finding that an employee's knowledge of the employer's business strategy and other confidential information support application of a restrictive covenant); *Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 347 (Va. 2005) (holding that a restrictive covenant was enforceable from a public policy standpoint where it protected the employer's ability "to maintain the contracts that enable it to be a viable entity, *particularly in the areas of national security and defense*").

Having determined that the restrictive covenant is enforceable against Sasnett, the court must consider whether there exists any genuine dispute of material fact as to Sasnett's alleged breach and resulting damages, or whether TechINT is entitled to judgment against Sasnett as a matter of law. Red Six was a TechINT client until it cancelled its purchase order with TechINT shortly after Sasnett resigned. Nonetheless, Sasnett joined Red Six's employ as of October 17, 2017—only a week after leaving TechINT—and provided UAS services to Red Six as its employee. (Sasnett Dep. 111.)[15] Sasnett clearly breached the restrictive covenant.

As for damages, Crino acknowledged that he cancelled Red Six's purchase order with TechINT after hiring Sasnett because Red Six no longer needed to outsource the work.[16] (Red

---

[15] In opposition to TechINT's motion for a preliminary injunction, Sasnett attempted to avoid potential liability by arguing that he did not provide services to Red Six, but to Red Six's clients. The court previously rejected this argument and will not revisit it here. (Prelim. Inj. Mem. Op. 10.)

[16] When asked why Red Six cancelled the purchase order, Crino, on behalf of Red Six, answered, "the purchase order was canceled the day after we hired Brandon. It's like inviting the chef into your house. I no longer have to go to the restaurant, the person who I was – had the understanding could work for me, the day after I hired

Six. Dep. 78–79.) TechINT has thus established that it suffered at least a loss of business expectancy from Red Six as a direct result of Sasnett's breach. Accordingly, the court will grant summary judgment to TechINT as to liability on Count I of its complaint.

Nonetheless, although TechINT has established that it suffered damages sufficient to establish Sasnett's liability for breach of contract, it has not provided sufficient facts regarding the extent of those damages.[17] Accordingly, the court will not award damages on summary judgment and will instead reserve the issue of damages for trial.

### 2. Tortious interference (Sasnett & Crino)

TechINT next seeks summary judgment on Count II of its complaint for tortious interference with Sasnett's contract and TechINT's business expectancy. To prove tortious interference, TechINT must show "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). Where the interference affects a contract terminable at will or merely a contract or business expectancy, the plaintiff must also show that the defendant used "improper methods" to interfere. *Id.* "Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law

---

him was now working for me, and I was going to use him at the event . . . . So I wasn't going to continue the purchase order with TechINT . . . ." (Red Six Dep. 79.)

[17] For example, TechINT argues that Sasnett further breached the agreement with TechINT by providing services to "the agency," ELTA NA, SSMC, Cherokee Nation, Combating Terrorism Technical Support Office, Battelle, and Canadian Special Forces (Funicello Supp. Decl. ¶¶ 8–20), and by soliciting Stafford for hire. (Pl. Br. in Opp. 14.) It has not, however, provided sufficient facts to determine whether TechINT had a valid expectancy of future business from these companies or the value the court should place on those expectancies.

rules." *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). "Improper methods may include

violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit,

defamation, duress, undue influence, misuse of inside or confidential information, or breach of a

fiduciary relationship." *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870

(Va. 2011) (quoting *Duggin*, 360 S.E.2d at 836). "Methods also may be improper because they

violate an established standard of a trade or profession, or involve unethical conduct." *Duggin*,

360 S.E.2d at 837 (citations omitted).

      *a. Sasnett*

TechINT argues that Sasnett interfered with TechINT's existing purchase order with Red

Six and its business expectancies with ELTA NA, USMC, Cherokee Nation Strategic Programs,

Combating Terrorism Technical Support Office, Battelle, and Canadian Special Forces, which

caused a termination or "disruption" of those relationships. The parties dispute whether the

relationship between TechINT and Red Six was based in contract or merely a purchase order that

was terminable at will. (*Compare* Funicello Aff. ¶ 26, Dkt. No. 158-1 ("TechINT obtained a key

UAS contract with Red Six . . . [and] submitted a purchase order to TechINT confirming this

contract."), *with* Red Six Dep. 78 ("[I]t is only a purchase order, it's not a contract. So either

party is available to sever it at any time, and you don't need a reason to sever a purchase

order.").) Regardless, because Sasnett engaged in "improper means" when he interfered with

TechINT's expectation of continued or future business with Red Six, the court will grant

summary judgment as to this claim.

As discussed above, TechINT has shown that it had a valid business expectancy with

respect to its course of dealing with Red Six. Sasnett also clearly knew about the business

expectancy, as his role at TechINT involved providing services to Red Six directly and helping

TechINT grow its UAS business. Thus, Sasnett's actions satisfy the first two elements of TechINT's tortious interference claim.

Sasnett also interfered with TechINT's business expectancy when he breached his contract and provided UAS services to Red Six as discussed above. The Supreme Court of Virginia has held that "under certain circumstances, an employee's breach of his/her contractual duties may constitute the 'improper method' necessary to sustain a cause of action for intentional interference with an employer's at-will contract." *Hilb, Rogal & Hamilton Co. of Richmond v. DePew*, 440 S.E.2d 918, 921–22 (Va. 1994). The business expectancy here is akin to an at-will contract. *Dunlap*, 754 S.E.2d at 318 (applying the same requirements to a contract terminable at will and a business expectancy). In a situation such as this, where the parties deal with confidential and proprietary information in a field where non-competition agreements and restrictive covenants are common (Crino Dep. 17–18), a breach of such contractual provision likely falls within the intended scope of the "contractual duties" referred to by the Supreme Court of Virginia in *Hilb, Rogal & Hamilton Co*. Accordingly, the court finds that Sasnett interfered with TechINT's business expectancy by improper means.

Like TechINT's claim against Sasnett for breach of contract, the extent of TechINT's damages are unclear. Although it alleges business expectancies with numerous entities other than Red Six, there remains a dispute of fact regarding the validity of those expectancies and the damages resulting from Sasnett's interference. Thus, the court will reserve the issue of damages on TechINT's tortious interference claim for trial.

*b. Crino*

As for its claim for tortious interference against Crino, TechINT argues that Crino interfered with the restrictive covenant in the services agreement between Sasnett and TechINT.

The parties first disagree about whether the services agreement is terminable at will, which would require TechINT to establish improper means. Crino points to language in the agreement stating that "[t]he Company's engagement of Sasnett shall be on an at-will basis, and the Company may terminate this Agreement and Sasnett's engagement . . . at any time and for any reason, or for no reason." (Servs. Agreement ¶ 2.) However, the court finds that this case is analogous to *DePuy Synthes Sales, Inc. v. Jones*, No. 2:13cv392, 2013 WL 8118533 (E.D. Va. Nov. 5, 2013), and therefore concludes that the services agreement was not terminable at will.

In *DePuy*, the employees similarly entered into employment agreements that allowed them to resign at will but also imposed post-termination restrictions that could not be terminated unilaterally. *Id.* at *4. Similar to here, the employer in that case brought a claim for tortious interference with the employment contracts. The court explained why contracts terminable at will are treated the same as expectancies: "when an individual's interest in a contract is terminable at will, it is 'essentially only an expectancy of future economic gain . . . .'" *Id.* However, "DePuy had more than an expectancy of future gain with respect to [the defendants]. Both men were parties to enforceable contracts which, for 18 months, precluded the exact employment relationship they are alleged to have begun." *Id.* at *5.

The same is true here. Although Sasnett's employment with TechINT was at will, the agreement clearly sets forth restrictions intended to extend beyond Sasnett's resignation or termination from TechINT. Thus, the contract at issue was not terminable at will, and TechINT need only establish that Crino intentionally interfered—it need not identify improper means.[18]

---

[18] In his response, Crino also argues that the services agreement is not enforceable against Sasnett because TechINT breached the agreement first when it failed to pay Sasnett dividends for his membership interest. However, W. Keith Haney, a CPA employed by the accounting firm providing services to TechINT, testified that TechINT did not and does not owe Sasnett any distributions, as TechINT decided not to make any distributions for the period during which Sasnett owned a membership interest. (Haney Aff. ¶¶ 5–9, Dkt. No. 163-2.) Crino also argues that there is no evidence he acted in his individual capacity rather than on behalf of Red Six. The court previously rejected this argument. (Mem. Op. Crino Mot. to Dismiss 4 ("[A]n agent acting within the scope of his

As to the remaining elements, the record establishes that Crino became aware of Sasnett's restrictive covenant on November 1, 2017.  (Crino Dep. 8.)  However, there remains a dispute of fact regarding whether Crino intentionally interfered with Sasnett's services agreement.  TechINT argues that Crino told Sasnett to "go full bore" on providing UAS services later in November.  However, Crino disputes this fact, emphasizing that TechINT's basis for this statement is "hearsay on multiple levels."  (Def. Br. in Opp. 11, Dkt. No. 161.)  Significantly, Sasnett has confirmed that Crino's alleged "full bore" comment was not a direct quote.  (Sasnett Aff. ¶ 25, Dkt. No. 161-1.)  The court agrees with Crino and will not rely on this off-hand remark to impose liability on Crino for tortious interference.

Notably, TechINT has not pointed to any additional facts in its motion that would suggest summary judgment is appropriate on this claim.  To be sure, it is telling that Sasnett remained employed with Red Six until August 2019.  However, that does not relieve TechINT of its burden on summary judgment.  Instead of pointing to additional facts in the record that support its position, TechINT cites to facts opposing its position and then merely rejects those facts as "incorrect."  In doing so, TechINT relies on admittedly disputed facts in support of its claims.  Thus, the court will deny TechINT's motion for summary judgment on Count II of its complaint.

### 3. Permanent Injunctive Relief (Sasnett)

The last claim in TechINT's motion for partial summary judgment is Count VI seeking permanent injunctive relief against Sasnett.  To obtain permanent injunctive relief, TechINT must show: (1) irreparable injury; (2) inadequate remedies at law, including monetary damages; (3) "that considering the balance of hardships between the parties, the remedy is warranted"; and

---

employment can nonetheless be liable for his own torts." (quoting *VanBuren v. Grubb*, 733 S.E.2d 919, 923 (Va. 2012)).)  Regardless, at the hearing on September 26, 2019, Crino waived both of these defenses, and the court granted summary judgment to TechINT as to both defenses.  (Dkt. No. 213.)

(4) that such injunction would not "disserve" public interest. *Canada v. Mathena*, No. 7:13CV00322, 2014 WL 3748300, at *9 (W.D. Va. July 29, 2014) (citing *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007). For the reasons set forth above, the court will not determine what, if any, monetary damages are appropriate at this stage of the proceeding. Moreover, several claims against both defendants remain undecided. Accordingly, it is unclear whether permanent injunctive relief against Sasnett is appropriate at this time, and the court will deny TechINT's motion as to Count VI.

### III. CONCLUSION

For the reasons stated above, the court will grant both parties' motions for partial summary judgment in part and deny them in part. Specifically, the court will grant Crino's motion as to Count IV for conspiracy. It will grant TechINT's motion as to Sasnett's liability on Count I for breach of contract but will reserve the issue of damages for trial. Similarly, the court will grant TechINT's motion as to Sasnett's liability on Count II for tortious interference but will reserve the issue of damages for trial. The court will deny the remainder of the parties' motions for summary judgment.

Entered: October 7, 2019.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge